IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CLAUDIA S. RODRIGUEZ-BORTON,
et al.,

> **Plaintiffs,**

> **v.**

HON. MIGUEL A. PEREIRA-CASTILLO,
et al.,

> **Defendants.**

**CIVIL NO.** 06-1754 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

This is a civil rights action requesting damages for constitutional violations culminating in the death of Karl Michael Rodriguez-Gonzalez ("Mr. Rodriguez"), who was a pretrial detainee housed in a Puerto Rico prison.  Plaintiffs[1] bring this action

---

[1] Named plaintiffs are decedent Karl Michael Rodriguez's relatives: Ana M. Gonzalez-Alvarado (his mother); Fermina Izquierdo-Alvarado (his grandmother); Cristina Rodriguez-Gonzalez, Maritza M. Rodriguez-Gonzalez, Maria M. Morales-Gonzalez, Mayte Morales-Gonzalez and Ana M. Morales-Gonzalez (his sisters); and Claudia Rodriguez-Borton and Ana Rodriguez-Tucker (his daughters).  (Docket No. 110, Exhs. 1-8) The Court dismissed the federal claims of all plaintiffs except for those of Karl Michael Rodriguez's two daughters, who are his heirs.  (Docket No. 157)  Because a federal cause of action remains outstanding for Karl Michael Rodriguez's heirs, all of the plaintiffs' state claim(s) remain active. In this opinion, however, the Court's reference to plaintiffs with regard to federal claims refers only to Mr. Rodriguez's two daughters.

against defendants[2] in their individual capacities under 42 U.S.C.
§ 1983 alleging violations of the Fifth and Fourteenth Amendments
of the United States Constitution and various state laws of the
Commonwealth of Puerto Rico.  See 28 U.S.C. § 1367.  Defendants are
or were officials or employees in the Puerto Rico prison system.
Plaintiffs allege, among other things, that defendants "failed to
comply with their duty to protect Karl Michael from unreasonable
risk of violence while in confinement."  (Docket No. 128)

Pending before the Court is a summary judgment motion filed by
defendants (Docket No. 109.)  Plaintiffs opposed defendants' motion
for summary judgment (Docket No. 128.)[3]  Plaintiffs allege that
defendants' conduct caused a violation of Mr. Rodriguez's due
process rights during his incarceration as a pretrial detainee.
Specifically, plaintiffs contend that defendants' failure to take
action to correct clear and well-noticed deficiencies in the

---

[2] Defendants are Miguel Pereira-Castillo, Collette Santa, Melvin
Burgos-Brandi, Abraham Antonetty-Santiago, Agustin Pagan-Rodriguez,
Victor Rivera-Percy, Jose Feliciano-Suarez, and Jose Rodriguez-Cruz.
Plaintiffs voluntarily dismissed their claims as to Jose Perez-Burgos,
Kenneth Castro-Muñiz, Alberto Morales-Camacho, Leonides Arroyo-Perez,
Ivette Miranda-Flores, Luis A. Planas-Camacho, and Miguel A. Rivera-Ortiz
on December 10, 2008, pursuant to Federal Rule of Civil Procedure 41.
(Docket No. 138)  The Court granted the voluntary dismissal of claims
against those defendants with prejudice, without imposition of costs,
expenses or attorneys fees on December 10, 2008.  (Docket No. 139)

[3] Plaintiffs' opposition to the motion for summary judgment also
included, in the same document (Docket No. 128), a cross motion for
partial summary judgment against the defendants.  Defendants moved to
strike the plaintiffs' cross motion for partial summary judgment (Docket
No. 133) for failure to comply with the Court's deadlines, and plaintiffs
filed a motion in opposition (Docket No. 135.)  The Court granted the
defendants' motion to strike (Docket No. 149.)

correctional facility where Mr. Rodriguez was held led to his death, constituting a deprivation of his right to be safe from the attacks of other inmates. Defendants move for summary judgment based on grounds that: (1) Plaintiffs failed to demonstrate that defendants acted with deliberate indifference; and, (2) defendants are nevertheless entitled to qualified immunity.[4]

For the reasons stated below, the Court **DENIES IN PART** and **GRANTS IN PART** defendants' motion for summary judgment.

## I.   Factual Background

### A.   Plaintiffs

Mr. Rodriguez, the decedent, had two daughters, Claudia S. Rodriguez-Borton and Ana D. Rodriguez-Tucker. Both daughters are plaintiffs in this case, and both daughters are minors, each represented by a surviving relative: Michelle Borton, Claudia's mother, represents Claudia; Donna Cwynar, Ana's grandmother and legal custodian, represents Ana. (Docket Nos. 110 and 159)

---

[4] The issue of plaintiffs' standing, also raised in the defendants' motion for summary judgment, was already resolved by the Court. (Docket No. 157)

Civil No. 06-1754 (FAB)                                                      4

   **B.   Defendants[5]**

      **1.   Miguel Pereira-Castillo**

            Miguel Pereira-Castillo was the Administrator of the
Administration of Corrections of the Commonwealth of Puerto Rico
and Secretary of the Department of Correction and Rehabilitation.

      **2.   Collette Santa-Rodriguez**

            Collette Santa-Rodriguez was the Regional Director
of Administration of Corrections Southern Region (under which sat
the institution of Annex 246).

      **3.   Victor Rivera-Percy**

            Victor Rivera-Percy was the Superintendent of the
correctional institution known as Annex 246.

      **4.   Melvin Burgos-Brandi**

            Melvin Burgos-Brandi was the Commander of the Guards
at the correctional institution known as Annex 246.

      **5.   Abraham Antonetty-Santiago**

            Abraham Antonetty-Santiago was the officer assigned
to the hallway of Annex 246, Sections Green and Yellow, from
10:00 p.m., July 31, 2005, to 6:00 a.m., August 1, 2005.

---

[5] All titles are accurate for the times relevant to the complaint.

### 6.   Jose Rodriguez-Cruz

Sergeant Jose Rodriguez-Cruz was the Supervisor in charge of the shift from July 31, 2005 at 10:00 p.m. to August 1, 2005 at 6:00 p.m. in Annex 246.

### 7.   Jose Feliciano-Suarez

Sergeant Jose Feliciano-Suarez was the Supervisor in charge of the shift on August 1, 2005 from 6:00 a.m. to 2:00 p.m. in Annex 246.

### 8.   Agustin Pagan-Rodriguez

Agustin Pagan-Rodriguez was the Correctional Officer assigned to the hallway of Annex 246, sections green and yellow, from 6:00 a.m. to 2:00 p.m. on August 1, 2005.

## C.   Events Surrounding Mr. Rodriguez's Death

Mr. Rodriguez was a pre-trial detainee under the custody of the Administration of Corrections ("AOC") at Las Cucharas Correctional Complex in Ponce, Puerto Rico.  (Docket Nos. 56 and 84)  On July 28, 2005, Mr. Rodriguez was transferred from the institution in the complex known as Ponce 676 to the institution called Annex 246.  Id.  In Annex 246, Mr. Rodriguez was assigned to cell 21 of the wing known as the Green Section.  Id.

In the early morning hours of August 1, 2005, Mr. Rodriguez was found dead by hanging in cell 13 of Annex 246; cell 13 was  assigned  to  inmate  Jose  L.  Torres-Santini

("Mr. Torres").  Id.  The press was incorrectly informed that the

deceased inmate was Mr. Torres, not Mr. Rodriguez.  Id.

        Many correctional officers and officials were assigned to

the institution where Mr. Rodriguez was housed.[6]  Correctional

officers Jose A. Rodriguez-Cruz (Supervisor) and Abraham Antonetty

(Housing[7] 1) were assigned to work during the night shift starting

July 31, 2005 at 10:00 p.m. and ending August 1, 2005 at 6:00 a.m.

(Docket No. 165, Exh. 1)[8]  Correctional Officer Agustin Pagan was

assigned to Housing 1 during the 6:00 a.m. to 2:00 p.m. shift on

August 1, 2005.  (Docket No. 110, Exh. 22)[9]

        According to a letter written on August 3, 2005 by Victor

Rivera-Percy, Superintendent of Annex 246, William Torres-Santiago

was the "On Call" Superintendent for Annex 246 during the weekend

of July 30 and July 31, 2005.  It is unclear from the report,

however, at what time his shift began and ended.  (Docket 145,

---

[6] The Court discusses only those staff members who are relevant to
issues raised in the defendants motion for summary judgment.

[7] The position was entitled "Vivienda 1" in the original Spanish
language roster sheet.  This could also be understood as "living area."

[8] Defendants failed to file many translations of their exhibits.
Defendants' exhibits 19, 22, 25, 27 and 28 (in support of defendants'
statements of material fact numbers 21, 23, 24, 26, 27, 28, 30, 31, 32,
34 and 36) were not provided to the Court in translated form.  Where not
supported otherwise by other exhibits provided by either defendants or
plaintiffs, or easily found by the Court's own review of exhibits, the
Court will consider the factual allegations unsupported and, therefore,
stricken from the record.

[9] Exhibit 22 was not translated into English, therefore the Court
does not rely upon it and uses it here only to clarify the position held
by one of the defendants in this case.

Exh. 17)  Also according to that report, Mr. Rivera-Percy "had been officially transferred to the Institution Ponce Principal and was working in that institution on August 1, 2005." Id.

During his shift on July 31 and August 1, 2005, correctional officer Abraham Antonetty saw inmates moving out of their cells.  (Docket No. 165, Exh. 28)  Mr. Antonetty entered comments into a "Control Sheet of Signatures After Making Preventative Rounds."  In that form, the living area officer appears to report his or her hourly observations about conditions in the Green and Yellow sections of the Ponce Correctional system where Mr. Rodriguez was housed.  (Docket No. 145, Exh. 21)  In the form, Mr. Antonetty entered the comment "Everything normal" at 10:00 p.m. and 11:00 p.m. on July 31, 2005, and at 12:00 a.m., 1:00 a.m., 2:00 a.m., 3:00 a.m., 4:00 a.m., and 5:00 a.m. on August 1, 2005. Id.  At 11:00 p.m. on July 31, 2005, Mr. Antonetty additionally entered the comment, "recount." Id.

At 6:00 a.m., correctional officer Agustin Pagan began his shift.  Mr. Pagan's 6:00 a.m. entry in the Control Sheet form stated "Recount" and "I notice inmate apparently hung." Id. Mr. Pagan testified in deposition that he conducted a recount of inmates at around 6:00 a.m. on August 1, 2005, during which time his supervisor, Jose Feliciano-Suarez, arrived to take inmates to their court appearances.  (Docket No. 145, Exh. 24)  Mr. Pagan further testified that he then was then informed by an inmate to

recheck cell number 13.  Id.  Mr. Pagan stated that he went toward cell 13 and noticed then that there was an inmate hanging in the cell.  Id.  Mr. Pagan proceeded to inform supervisor Suarez of the situation.  Id.

When Mr. Pagan located the inmate's identity card to verify the name of the dead inmate, he identified the body as that of Jose L. Torres-Santini, who, according to the official list, was assigned to cell 13.  (Docket No. 165, Exh. 28)  Mr. Rodriguez was therefore incorrectly identified as Jose L. Torres-Santini.  Id. According to a preliminary report of Mr. Rodriguez's death written by Agent Adam Torres, an investigating agent in the AOC system, "at the time that Officer Pagan realized that there was a dead inmate in the cell, he took the card that was in the cell and didn't corroborate that the photo and the information on the card was correct," which led AOC personnel to report the decedent's identity incorrectly to the Corrections Press Unit, the Puerto Rico Police and the family member.  (Docket No. 145, Exh. 26)

During the months of July and August, 2005, only two "incidents" were officially reported in Annex 246 on reports maintained by AOC of incidents in the various AOC correctional institutions.  (Docket No. 145, Exh. 20)  No incidents were officially reported on the AOC incident sheet for July 31, 2005 or August 1, 2005.  Id.  Plaintiffs point out that, although the incident sheet contains no record of any disturbance on July 31 or

August 1, 2005, it fails even to record the instance of Mr. Rodriguez's death. (Docket No. 159) Christina Rodriguez-Gonzalez, Mr. Rodriguez's sister, testified during an oral deposition that Annex 246 Superintendent Victor Rivera-Percy told her that there has been a riot in the institution where her brother was held. (Docket No. 165, Exh. 16) There was no official indication of such an event in the AOC incident report sheet. Id. Nothing in the record indicates that Mr. Rodriguez informed any AOC staff that he was in danger of violence or harassment; relatives of Mr. Rodriguez testified, however, that Mr. Rodriguez informed them during various telephone calls that he was being assaulted.[10]

---

[10] The Court notes its frustration with the lack of proper organization and citation in the records and exhibits of both parties. Some oral depositions appear without a date and some fail to state the name of the deponent. No list of exhibits, with document title or other identifying information, was filed to guide the Court in its review of Plaintiffs' certified translations of exhibits in support of material facts. Without a list of exhibits, the Court simply has before it a binder of numbered documents. Furthermore, the exhibits of both parties are, at places, misnumbered or, perhaps due to the translation from Spanish to English, many cited page numbers are altogether incorrect, requiring the Court to search through records to locate the intended content. Some material facts contain citations to exhibits which were simply not provided to the Court (Defendants did not provide, for example, Exhibits No. 19, 22, 25, 27 or 28 and Plaintiffs did not provide their additional Exhibit No. 17). The Court need not and should not take on the tedious and unnecessary busy work of searching for cited materials and correct page numbers. Sloppy pleadings make the Court's adjudication process cumbersome and needlessly slow. Worse, parties are harmed when their attorneys fail to properly organize and cite documents, as the Court often has no choice but to disregard facts that are improperly labeled or cited.

The manner of Mr. Rodriguez's death remains unclear.[11]
In Forensic Pathologist Dr. Francisco Cortes' autopsy report of
Mr. Rodriguez, Mr. Cortes concluded that Mr. Rodriguez died of
asphyxiation by suspension, but that the manner of death was still
pending investigation. (*Forensic Report*, Docket No. 165, Exh. 23)
Agent Pablo Diaz-Guzman of the Criminal Investigation Corps of
Puerto Rico's Police Department was unable to conclude whether the
manner of death was a suicide or homicide, and the investigation,
now headed by Agent Angel Ortiz, still continues. (Docket No. 165,
Exhs. 20, 22 and 32)   Agent Ortiz received information from an
inmate that Mr. Rodriguez was executed and that two inmates
participated in the execution. (*Deposition of Angel Ortiz*, Docket
No. 165, Exh. 32)   Agent Ortiz testified, however, that he could
not determine whether the death was a suicide or a homicide. Id.

The AOC conducted its own investigation of the incident
regarding administrative responsibility on the part of any AOC
personnel. (Docket No. 165, Exh. 27)   Investigating Agent Melissa
Rodriguez-Roth conducted the investigation and, on February 26,
2006, issued a final report. (Docket No. 165, Exhs. 26 and 28)   In

---

[11] The Court addresses its analysis to the plaintiffs' theory of the
case and the allegations based on that theory.   Plaintiffs contend that
Mr. Rodriguez was killed by fellow inmates.   Plaintiffs have presented
adequate evidence to support that allegation.   Although defendants'
contend that Mr. Rodriguez died by suicide, they may present their
alternative theory to the jury; the Court only addresses defendants'
grounds for summary judgment that respond to allegations made in the
plaintiffs' complaint.   Whether the manner of death was in fact a
homicide is a matter for the jury, not this Court, to determine.

the final report Ms. Rodriguez-Roth found, in relevant part, that correctional officer Abraham Antonetty knew that inmates were moving out of their assigned cells and that the cell locks were malfunctioning. (Docket No. 165, Exh. 28)  Furthermore, the report concluded that, "although knowing of the unsecured conditions of the Section, Officer Antonetty admitted abandonment of post and returning to the area on an hourly basis." Id.  According to the report, Officer Antonetty admitted staying inside the control pod during his shift, where his view of inmate activity was obstructed, and failing to comply with the post assignments requiring supervision rounds of the section under his custody and constant alertness to prevent misconduct and violence.  Id.  The report concludes that, for these reasons, Officer Antonetty was negligent in the performance of his duties.  The report also concludes that supervisor Jose Feliciano-Suarez was negligent by improperly identifying the dead body as being that of Mr. Rodriguez.  Id.

**D.   Overview of the AOC and Duties of AOC Personnel Related to Inmate Safety**

The Administration of Corrections of the Commonwealth of Puerto Rico is "responsible for providing and offering safety in the correctional institutions, so that the integrity of life and property of the members of the correctional population, the staff and citizens are guaranteed." (Docket. No. 145, Exh. 9A; Docket No. 110, Exh. 9)  To fulfill this and its other responsibilities, the AOC operates according to a complex organizational scheme in

which essential functions are decentralized among many regions and among many individuals.[12]  (Docket No. 145, Exh. 9A and 9B; Docket No. 110, Exh. 9 and 9B)

According to the AOC Manual of Norms and Procedures,[13] "The Administrator shall have the maximum responsibility [for] the planning and execution of the goals and objectives established by the Agency."  (Docket No. 145, Exh. 9A)  Under the AOC's organizational plan, however, the Administrator has broad power to delegate "authority and responsibility . . . within a framework that would sponsor efficiency and constant improvement of the procedures of the Agency."  Id.

The AOC has delegated certain essential agency functions as follows:[14]

―――――――――――――――――――

[12] The Administrator may delegate on law officers any granted duty or faculty, "except the power of appointment, adopting regulation and formulating normative policies of the Administration."  (Docket No. 145, Exh. 9A)  Furthermore, the Administrator's power to delegate authority and responsibility on officers and people below him must be "expressly explicit."  Id.

[13] Specifically, this quotation is found in AOC Manual of Norms and Procedures, re:  Philosophy and Goals of the Administration of Corrections and the Delegation of Authority.  (Docket No. 145, Exh. 9A; Docket No. 110, Exh. 9)

[14] See Docket No. 145, Exh. 9B.  The exhibit cited by defendants, Administration of Corrections Administrative Order No. ACV-2000-20, is titled "Regionalization of the Essential Areas of the Administration of Corrections (Revised)" and sets forth the agency's organizational structure.  The Court notes that the Order's explanation of agency hierarchy and responsibility does not usurp the Administrator's ultimate control of all institutional function.  Indeed, the Administrator is charged to maintain the system by which he or she is timely and adequately notified of lower-level functioning (or non-functioning) and retains ultimate decision-making power to correct problems manifested throughout the agency.

1.   The Central Office is generally responsible for supervising all regional institutions and programs;

2.   The Correctional Population Handling Office, an office created pursuant to Federal Court stipulations in the case of Carlos Morales-Feliciano[15] ("Morales-Feliciano case"), has established a correctional population control system which audits, daily, the status of institutional compliance with the Federal Court's orders;

3.   The Compliance Office is responsible for strict compliance with orders issued by the Federal Court in the Morales-Feliciano case, including coordination within the agency, auditing, evaluating, monitoring and supervising necessary in institutional operations, reporting and advising the AOC Administrator to ensure compliance, and maintaining a data bank to document all information related to the Morales-Feliciano case;

4.   The Security Office is responsible "for the custody of all persons who arrive at a correctional institution by order of a competent authority," including the implementation and monitoring

---

[15] See the following list, though not exhaustive, of published opinions for the Morales-Feliciano litigation: Morales Feliciano v. Acevedo Vila, No. 79-4, slip op. (D.P.R. 2000); Hernandez Colon v. Morales Feliciano, 498 U.S. 879 (1990); Morales-Feliciano v. Parole Board of the Commonwealth, 887 F.2d 1 (1st Cir. 1989); Morales Feliciano v. Hernandez Colon, 775 F.Supp. 487 (D.P.R. 1991); 775 F.Supp. 477 (D.P.R. 1991; 771 F.Supp. 11 (D.P.R. 1991); 757 F.Supp. 139 (D.P.R. 1991); 754 F.Supp. 942 (D.P.R.1991); 704 F.Supp. 16 (D.P.R. 1988); 697 F.Supp. 51 (D.P.R. 1988); 697 F.Supp. 37 (D.P.R. 1988); 672 F.Supp. 627 (D.P.R. 1987); 697 F.Supp. 26 (D.P.R. 1987); 697 F.Supp. 51 (D.P.R. 1988); Morales Feliciano v. Romero Barcelo, 672 F.Supp. 591 (D.P.R. 1986); 497 F.Supp. 14 (D.P.R. 1979).

of security measures in compliance with security plans approved by the Federal Court;

5.   The Human Resources Office is responsible for "administering the human resources of the Agency" and ensuring compliance with Federal Court orders issued pursuant to the Morales-Feliciano case regarding personnel administration, including personnel recruitment.  (Docket 145, Exh. 9B at 20-23);

6.   The AOC's Training Program is implemented by 11 work units within the organizational structure of the agency and overseen both by various regional Personnel Directors, the Head of Personnel at Central Level and the AOC Administrator (See Docket No. 145, Exh. 12);[16]

7.   The Discipline Office carries out duties pursuant to Federal Court orders related to the Morales-Feliciano case.  It is responsible for managing any disciplinary action or investigation against correctional institution personnel.  (Docket No. 145, Exh. 9B at 23-25);

8.   The Deputy Secretary of Investigations of the Correctional System (SAISC) is responsible for administrative investigation of AOC employees.  (Docket 145, Exh. 14)  According to SAISC's Enabling Memorandum, among other procedural requirements, "[T]he heads of the component agencies will refer the

---

[16] See Docket No. 145, Exh. 12: the Administration of Correction's "Manual of Standards and Procedures" in its chapter on Training.

cases which justify being investigated by the SAISC to the Secretary, so that it determines if it proceeds that it be investigated by the same, and, if deemed necessary, it will remit it to said office to proceed with the investigation." Id. at 12-13.

**E.   Security in Annex 246**

At least three years prior to the death of Mr. Rodriguez, the cell locks on Annex 246 were broken or malfunctioning.  This situation caused inmates to move out of their respective cells at night.  (Docket No. 165, Exh. 12)  The lock of cell 21, where Mr. Rodriguez was assigned, and the lock of cell 13, where Mr. Rodriguez was found dead, were both reportedly damaged or malfunctioning since at least the first week of February 2005, six months prior to the day of Mr. Rodriguez's death on July 31 or August 1, 2005.  (*Weekly Maintenance Reports of Annex 246*, Docket No. 165, Exh. 7)  From at least June 22, 2005 until August 1, 2005, cell 13 was the only cell of the entire Green Section of Annex 246 without a working light.  (Docket No. 165, Exh. 7)

In a letter written on August 3, 2005, Annex 246 Superintendent Victor Rivera-Percy reported the following regarding the conditions of cell locks and inmate movement in Annex 246 and his effort to improve those conditions:

> About three years ago, this institution began to have defects in the cylinders and locks of the cells due to wear and the insistence of the inmates in vandalizing them.  Nevertheless, in measures taken by the undersigned

> we achieved the approval for the purchase of 22 locks at
> a cost of approximately $23,000.00.  The same need to be
> installed and the approval of the rest is still pending
> . . .  It's worth mentioning that this situation brings
> about that after 6:00 p.m., specifically in hours of the
> night, the inmates get out of their cells or due to that
> they exchange their cells.

Docket No. 165, Exh. 12.

Pursuant to the post assignments (*Ordenes de Puesto*), among other things, correctional officers are instructed to stay inside their post area or otherwise keep continuous patrol in that area.  Every movement of an inmate outside of his or her assigned cell must be under the custody of the assigned officer. Correctional officers shall also "verify that the equipment, supplies and other things assigned to the post be in good state of repairs when released" and "shall report to [his] immediate supervisor about any irregularity that is observed for the corresponding investigation."  (Docket No. 165, Exh. 2) Correctional officers must also report any existing security risk and make sure all gates in the officer's area be "fully locked and when opened to be used one inmate at a time."  Id.

Correctional officers on duty are supposed to perform headcounts of inmates several times during the day by verifying the identity of the inmates in each cell with photographs and by verbal count off. (*Institutional Counting Regulations*, Docket No. 165, Exh. 14)  AOC's Institutional Counting Regulations require a formal counting procedure in the correctional institutions between 5:30

and 6:00 a.m. in which the officer performing the count must ensure that he or she is counting a live human being.  Id.

AOC Administrator Miguel Pereira-Castillo stated his opinion that, in order to comply with Federal Court orders following the Morales-Feliciano case, correctional officers assigned to the housing or living area section of a correctional institution must be posted and patrolling inside the housing unit throughout his or her eight hour shift rather than posted and patrolling in the hallways outside or between the living areas. (Docket No. 165, Exh. 5)  Furthermore, Mr. Pereira testified that, to his knowledge, the stipulation reached in the Morales-Feliciano case requiring every that all cells must have working locks was still in effect and that, in his opinion, a malfunctioning lock ought reasonably to be repaired within a month to a month and a half.  If it took six months to repair the cell locks, Mr. Pereira agreed, the AOC would not be in compliance with the Morales-Feliciano federal court orders.  Id.  Mr. Pereira testified that if there were no officers patrolling the hallways and there were no locks on cells, the inmates would be essentially free.  (Docket No. 165, Exh. 8)

Mr. Pereira testified that he knew the Morales-Feliciano case addressed as a safety issue whether cell lights are functioning, and that it would be unreasonable for broken lights in cells to be left unrepaired for longer than two days.  Id.

Mr. Pereira further testified that if a particular section of the prison suffered from malfunctioning cell locks and, at the same time, no guard were posted inside the housing areas, that particular section would not meet safety standards set forth by the Morales-Feliciano case and by the AOC.  (Docket No. 165, Exh. 10)

        Mr. Pereira testified that one of his duties as Administrator and Secretary of the Department of Correction and Rehabilitation is to study security measures in the correctional institutions controlled by the agency and to implement measures to improve security.  (Docket No. 165, Exh. 4)  Mr. Pereira further agreed that he is the person ultimately responsible for AOC's compliance with the federal orders and AOC stipulations that came out of the Morales-Feliciano case.  Id.

### III. Summary Judgment Standard

    The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52. (1st Cir. 2000). The party moving for summary judgment bears the burden of showing

the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  Id. at 252.  It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## IV.  Legal Standards and Analysis

### A.   42 U.S.C. § 1983 Generally

Section 1983 is the basis for a federal cause of action seeking redress against any person acting under color of state law who deprives another of his or her constitutionally granted rights. 42 U.S.C. § 1983.  In pertinent part, this statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Id.

To prevail on a claim brought under section 1983, the plaintiff must factually support a determination (i) that the conduct complained of has been committed under color of state law, and (ii) that the alleged conduct deprived an individuals' rights, privileges or immunities as secured by the Constitution or laws of

the United States.   Rumford Pharmacy, Inc. v. City of East
Providence, 970 F.2d 996 (1st Cir. 1992) (citations omitted);
Parratt v. Taylor, 451 U.S. 527, 535 (1981) (overruled on other
grounds); Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st.
Cir. 1989).

        The second prong of section 1983 itself has two elements.
The first element requires that there was, indeed, a deprivation of
rights, privileges or immunities secured by the United States
Constitution or laws.   Voutour v. Vitale, 761 F.2d 812, 819 (1st
Cir. 1985).   The second element requires plaintiffs to show that
the alleged deprivation was caused by the defendants' conduct.   Id.
at 819.

        The second element of the second prong, the causation
element, then has three components.   Plaintiffs must show, first,
that each defendant's act or omission caused the deprivation of the
rights at issue.   Gutierrez-Rodriguez, 882 F.2d at 562; Figueroa v.
Aponte-Roque, 864 F.2d 947, 953 (1st Cir. 1989).   Plaintiffs must
show, second, that the defendants' conduct or inaction was
intentional, grossly negligent, or must have amounted to a reckless
or callous indifference to the constitutional rights of others.
Velazquez-Martinez v. Colon, 961 F.Supp. 362, 365 (D.P.R. 1997)
(internal citations and quotations omitted).   Finally, and thirdly,
plaintiffs must demonstrate an "affirmative link between the
street-level misconduct and the action, or inaction, of supervisory

officials." Id. (citing Gutierrez-Rodriguez, 882 F.2d at 562)
(internal citations and quotations omitted).

        All parties appear to agree that defendants acted within
the scope of their duties as state officers and employees at all
times relevant to this case.  (See Docket No. 84, *Answer to the
Amended Complaint*)  The first element required under section 1983
is therefore satisfied.   The Court must now determine whether
decedent Karl Michael Rodriguez was deprived of his federally
protected rights as a result of the events preceding his death.

    **B.   Pretrial Detainee Rights Under the Eighth Amendment**

        "The treatment a prisoner receives in prison and the
conditions under which he is confined are subject to scrutiny under
the Eighth Amendment."   Helling v. McKinney, 509 U.S. 25, 33
(1993); see Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir.
1999).   Pretrial detainees are protected under the Fourteenth
Amendment Due Process Clause rather than the Eighth Amendment,
which applies only to convicted inmates.   Burrell v. Hampshire
County, 307 F.3d 1, 7(1st Cir. 2002).[17]  Nevertheless, the First
Circuit Court of Appeals analyzes pretrial detainee rights under
the Fourteenth Amendment Due Process Clause applying the same
standard as that used in Eighth Amendment cases.   Burrell v.

_____

        [17] The Court previously dismissed all Eighth Amendments claims
because the Eighth Amendment applies only to convicted inmates, and Karl
Michael Rodriguez was a pretrial detainee.  (Docket No. 157)

Hampshire County, 307 F.3d 1, 7 (1st. Cir. 2002).[18]  Indeed, the

protections afforded pretrial detainees by the Fourteenth Amendment

are "at least as much" as the protection afforded inmates under the

Eighth Amendment.  Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir.

2007) (citing Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244

(1983)).

          Plaintiffs seeking relief for detrimental effects of

prison conditions look to the Eighth Amendment's cruel and unusual

punishment provision and the due process clause of the Fourteenth

Amendment.  Inmates of Suffolk County Jail v. Eisenstadt, 360

F.Supp. 676, 678 (D.Mass. 1973).  Claims brought under these

statutes involve alleged constitutional defects in "the quality and

level of incarceration" such as conditions of confinement which may

have a "deleterious effect upon the physical and mental health of

inmates."  Id.  Civil rights complaints stemming from alleged

deficiencies in the confinement conditions of a pretrial detainee,

_____

          [18] Under the Eighth Amendment analysis applied by districts sitting
in the First Circuit, pretrial detainees, like convicted inmates, have
a right to be free from "cruel and usual punishment."  An analysis under
the Due Process Clause of the Fifth Amendment would examine a pretrial
detainee's right to be free from "punishment."  See Petition for Writ of
Certiorari, Butler v. Fletcher, 127 S.Ct. 2128 (2007) (No. 06-955).  The
Court thus addresses plaintiffs' claims under the Eighth Amendment
framework, dismissing plaintiffs claims under the Fifth Amendment
forthwith.

as in this case, are thus examined under the Eighth Amendment's cruel and unusual punishment standard.[19]

### 1.   Eighth Amendment Liability

What amounts to "cruel and unusual punishment" at any particular moment in time casts light on "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101 (1958).  At this moment of our history, the Supreme Court has already made clear that prison officials have a duty to protect inmates from the attacks of fellow inmates.  Farmer v. Brennan, 511 U.S. 825, 833 (1994) ("Having incarcerated persons with demonstrated proclivities for antisocial, criminal, and often violent conduct, having stripped them of virtually every means of self-protections and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."); Giroux v. Gamble, 429 U.S. 97, 104 (1976).  Indeed, the safety of prisoners has been deemed by some judges to be a "crucial right." Velazquez-Martin v. Colon, 961 F.Supp. 362, 365 (D.P.R. 1997) (citing Farmer, 511 U.S. at 832, "[B]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society").  Since the recognition of this duty in Farmer, courts have applied it both to claims involving allegations

_____

[19] Plaintiffs' base their claims on the theory that Karl Michael's death was the predictable result of unconstitutional conditions of confinement.

of current physical abuse among prisoners and those alleging conditions that may cause harm to prisoners in the future.[20]  Not all harms or injuries suffered by a prisoner at the hands of other prisoners, however, give rise to a cause of action.  See Farmer, 511 U.S. at 834 (1994); Burrell, 307 F.3d at 7-8.

Prison officials violate the Eighth Amendment only when there has been an "objective, serious deprivation" resulting from "deliberate indifference to the health and safety of an inmate." Velazquez-Martinez, 961 F.Supp at 365 (citing Farmer, 511 U.S. at 837-88); See Wilson v. Seiter, 501 U.S. 294, 298 (U.S. 1991); Miller v. Neathery, 52 F.3d 634, 638 (7th Cir. 1995).  The so-called deliberate indifference standard is satisfied when a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842.  The Court in Farmer explained that deliberate indifference lays "somewhere between the poles of negligence at one end and purpose or knowledge on the other." Id. (internal citations omitted).  See Daniels v. Williams, 474 U.S. 327, 332 (1986) (negligent conduct does not constitute a Fourteenth Amendment deprivation).

2.  **Supervisory Liability**

Under section 1983, a supervisory official may be held liable for his subordinates' behavior only if (1) his

---

[20] For further analysis of the application of Eighth Amendment analysis to conditions of confinement, See Martin A. Schwartz et al., Section 1983 Litigation 68 (Federal Judicial Center, ed., 2nd ed. 2008).

subordinates' behavior results in a constitutional violation and (2) the official's action or inaction was affirmatively linked to that behavior such that "it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988)) (internal quotation marks omitted).

Supervisory liability may be found either where the supervisor directly participated in the unconstitutional conduct or where the supervisor's conduct amounts to "tacit authorization." See Camilo-Roble v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999).

Plaintiffs must show that each individual defendant was involved personally in the deprivation of constitutional rights since no respondeat superior liability exists under section 1983. Pinto v. Nettleship, 737 F.2d 130, 132 (1st Cir. 1984).

The deliberate indifference standard is utilized both for subordinate and supervisor liability. Furthermore, the deliberate indifference standard "reflects the section 1983 standard, requiring both deprivation and intent." See Velazquez-Martinez, 961 F.Supp at 366 (citing Sarah Botz and Robert C. Sherer, Substantive Rights Retained by Prisoners, 84 Geo L.J. 1466, 1479 (1996)). In determining defendants' liability in this case, the Court thus examines both the intent and causation elements for each defendant according to the nuances of the Eighth Amendment.

### 3.    Eighth Amendment Liability Analysis

The allegation here, that Karl Michael Rodriguez was killed while incarcerated at Annex 246, if true, more than hurdles the requirement that the deprivation alleged be objectively, sufficiently serious.  The dispute lies in the second prong of the Eighth Amendment test, that each defendant had a sufficiently culpable state of mind - the deliberate indifference standard.  To show deliberate indifference, plaintiffs must demonstrate that defendant(s) knew of a substantial risk of serious harm and disregarded that risk.  In their motion for summary judgment, defendants deny that they acted with the requisite deliberate indifference to sustain liability under the Eighth Amendment.

First, the Court will examine whether a substantial risk of serious harm existed.  Defendants maintain that inmates in Annex 246 faced no substantial risk of harm for prison officials to disregard deliberately.  (Docket No. 109 at 24)  To support this argument, defendants offer very little evidence.  Defendants point only to an incident report sheet for the months of July to September, 2005 in which few instances of violence in Annex 246 were reported and to the fact that the AOC found no documented reports of violence or harassment against Karl Michael Rodriguez.

Plaintiffs, however, offer ample evidence that the conditions at Annex 246 were unsafe and posed a substantial risk to inmates there.  Plaintiffs submit that inmate cell locks were

malfunctioning; that as a result of malfunctioning cell locks, inmates could possibly move in and out of their cells; that inmates were also free to move in and out of their cells because they were not properly supervised by correctional officers; that a correctional officer assigned to the housing unit of Annex 246 on the night of the incident admitted abandoning his post, instead stationing himself in an area where his view of inmates was obstructed; that the same correctional officer admitted that he noticed inmates moving freely outside of their cells; that inmate movement was widely known to occur; that cell locks at Annex 246 were known to be malfunctioning for years; that the cell locks of both cell 13 and cell 21 were damaged or malfunctioning for six months prior to Mr. Rodriguez's death; and that from at least June 22, 2005 until August 1, 2005, cell 13 was the only cell of the entire green section of Annex 246 without a working light.

Plaintiffs also present the testimony of AOC Administrator Miguel Pereira, who stated that if a particular section of the prison suffered from malfunctioning locks at the same time that supervision was inadequate, the section would not meet AOC safety standards or the Morales-Feliciano federal orders.

Based on the evidence provided by the parties, the Court finds that plaintiffs have adequately substantiated their allegation that there was a substantial risk of serious harm to the

decedent due to the lack of adequate inmate supervision and malfunctioning cell locks and cell lights.

          The Court next addresses whether an issue of material fact exists regarding defendants' subjective awareness and disregard of the risk of harm facing inmates in Annex 246, such that defendants would be liable under the deliberate indifference standard.

          Plaintiffs devote pages and pages of their opposition to the motion for summary judgment to the various federal court orders arising from the Morales-Feliciano case and its progeny.[21] In doing so, plaintiffs attempt to show that all defendants had ample notice about which kinds of security and staffing deficiencies are unsafe and unconstitutional because the Morales-Feliciano court orders made obvious what sorts of confinement conditions are unsafe. The "question of whether a prison official had the required knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways,

_____

          [21] Following the famous case, Morales-Feliciano v. Romero-Barcelo, 497 F.Supp. 14 (D.P.R. 1979), well-noted "security and staffing deficiencies" throughout the AOC system have more than once been deemed unconstitutional by the Federal Court, provoking a series of court orders requiring the AOC to implement system-wide corrective measures. (Docket No. 128 at 2)  Plaintiffs contend that in 2000, the district court ruled that the AOC's failure to implement the corrective measures as ordered created a substantial risk of violence against inmates.  (Docket 128 at 2)  While the Court does not rely on the findings of a 2000 case about the risk to inmate security in AOC correctional facilities, the Court does note prison officials' own awareness of the federal court determinations regarding what factors constitute security risks to prisoners.

including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 65 (1st Cir. 2002) (citing Farmer, 511 U.S. at 842) (internal citations and omissions omitted).

Plaintiffs contend that all defendants were aware of the kinds of risks certain deficiencies create for the inmate population because those risks were obvious.  For years, the AOC has been charged with designing and implementing system-wide security and staffing programs, among others, to correct those deficiencies.  Moreover, the AOC has, per order of the federal court, set up an entire office, the Compliance Office, charged with ensuring AOC's strict compliance with the Morales-Feliciano orders, supra section I(D) above.

Cognizance of the Morales-Feliciano federal court orders, alone, would not sufficiently demonstrate knowledge and disregard of risk as required by the deliberate indifference standard.  When there is evidence, however, that defendants were aware of specific security risks at times relevant to Mr. Rodriguez's death, such as damaged cell locks, poor inmate supervision and broken cell lights in Annex 246 and in Mr. Rodriguez's actual cell, as the record shows here, the Morales-Feliciano context - of a system ordered on numerous occasions to correct identified constitutional violations - buttresses

plaintiffs' contention that reasonable prison officials at AOC were well aware of the dangers posed to inmates in AOC institutions. See Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 562 (1st Cir. 1988) (working in a constitutionally dangerous system should make prison officials "increasingly sensitive to the need to avoid those acts or omissions, *within* their control, that might make matters worse").[22]

With this context in mind, the Court examines whether a reasonable juror, on the basis of the summary judgment record, could conclude that each defendant failed to take reasonable measures to eliminate or abate the safety risks to inmates of which he or she was subjectively aware.

### a.   Miguel Pereira-Castillo

Defendant Miguel Pereira-Castillo was the Administrator of the AOC since 2002 until the end of 2008.   In support of their allegation that Mr. Pereira failed to take reasonable measures to correct the security deficiencies at Annex

---

[22] Plaintiffs submitted lengthy quotations, not paraphrased or summarized in the slightest, from a 2003 report on Puerto Rico's prison conditions in order to make the analogy that prison conditions in 2005, when Mr. Rodriguez was housed in Annex 246, suffer similar deficiencies. While these reports may indeed put defendants on notice of what constitutes unsafe prison conditions, the Court views the report as irrelevant to the issue of defendants' awareness of the specific conditions of Annex 246 during the time Mr. Rodriguez was held there. Furthermore, the report is unnecessary to plaintiffs' argument. Plaintiffs can more adequately and appropriately demonstrate prison officials' notice of deficient conditions of confinement using evidence regarding the 2005 deficiencies.   Because of this redundancy, the Court does not include the report quotations in its citation of facts above.

246, plaintiffs present AOC documents and the testimony of Mr. Pereira himself. According to both the AOC Manual of Norms and Procedures and his own testimony, Mr. Pereira is the person ultimately responsible for AOC operations and for compliance with the Morales-Feliciano federal orders. Mr. Pereira further testified that he is responsible for staying informed about AOC security policies and procedures and then taking steps necessary to address shortcomings. He stated his own impression that AOC would not be in compliance with federal orders if correctional officers did not properly patrol inmate living areas, if cell locks were in disrepair for an unreasonable amount of time, and if cell lights were not working for an unreasonable amount of time.

Defendants argue that plaintiffs fail to introduce any evidence that Mr. Pereira knew specifically about the conditions in Annex 246 or that he knew of any risk specific to Mr. Rodriguez. Further, defendants point to the incident report for AOC institutions during the months of July, August and September of 2005 to show that few instances of violence were officially reported.

As discussed above, the question of whether a prison official had knowledge of a substantial risk could be inferred from facts showing that the risk was obvious. Calderon-Ortiz, 300 F.3d at 65 (citing Farmer, 511 U.S. at 842) (internal citations and omissions omitted). Furthermore, the Supreme Court

has made clear that "whether the prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk" is irrelevant. <u>Farmer</u>, 511 U.S. at 843. In addition to the general awareness plaintiffs have shown that all officials had of the federal orders requiring a minimum quality of confinement conditions, the record contains evidence that the cell locks in Annex 246, including the cell lock of cells 21 and 13, where Mr. Rodriguez lived and was discovered, were in disrepair for at least three years prior to Mr. Rodriguez's death. Furthermore, Annex 246 Superintendent Victor Rivera-Percy's letter stated that he "achieved the approval for the purchase of 22 locks" and that those locks must be installed but that "approval of the rest is still pending." Mr. Rivera-Percy also wrote in his letter that inmates get out of their cells at nights. These facts demonstrate that Mr. Pereira had ample opportunity to learn of and correct the conditions making Annex 246 unsafe.

A supervisor need not have actual knowledge of the offending conduct to be liable; a supervisor's behavior may be deemed liable "by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 582 (1st Cir. 1994). Thus, a supervisor may be liable "for the foreseeable consequences of such conduct in he would have known of it but for his deliberate indifference or wilful blindness, and if he has the power and

authority to alleviate it." Id. For this and the above-stated reasons, it is the view of this Court that the summary judgment record supports the inference that Miguel Pereira-Castillo's inaction with regarding security risks in Annex 246 was affirmatively linked to Mr. Rodriguez's death and constituted deliberate indifference.

### b.   Defendant Collette Santa-Rodriguez

Collette Santa-Rodriguez was the Regional Director of Administration of Correction Southern Region.  Other than naming her as a defendant and naming her position as an AOC administrator with the above title, which defendants did not dispute, plaintiffs did not mention Ms. Santa in their complaint nor did they submit any evidence or allege any facts indicating she had any particular administrative responsibilities regarding inmate security or any specific knowledge of security deficiencies. Because plaintiffs offer no facts regarding Ms. Santa other than her title, the Court concludes that no reasonable juror would be able to find Ms. Santa deliberately indifferent or even negligent. All claims against Ms. Santa are hereby **DISMISSED.**

### c.   Defendant Melvin Burgos-Brandi

Melvin Burgos-Brandi was the Commander of the Guard at Annex 246.  Like Ms. Santa, Mr. Burgos goes unmentioned in plaintiffs' complaint and unmentioned in plaintiffs' factual allegations in support of its opposition to summary judgement.  No

specific information has been provided by plaintiffs to help the Court access whether Mr. Burgos' responsibilities put him in a position where he could be found deliberately indifferent or negligent to inmate safety.  Although the title, Commander of the Guard at Annex 246, contains implications of duty and supervision (like Ms. Santa's title also implies), the Court cannot discern the possibility of deliberate indifference or negligence where no facts are offered from which to drawn an inference of responsibility in the first place.  Were the Court to make such inferences, any AOC official could be found liable just by virtue of their employment at the AOC.  All claims against Mr. Burgos are hereby **DISMISSED**.

### d.    Defendant Victor Rivera-Percy

Victor Rivera-Percy was the Superintendent of Annex 246 through the end of July, 2005.  He was officially transferred to another AOC institution on August 1, 2005.  He was not on duty during the night of Mr. Rodriguez's death.

Plaintiffs argue that Mr. Rivera-Percy knew about and did not correct the security problems in Annex 246.  In Mr. Rivera-Percy's letter, he discusses the malfunctioning cell locks in Annex 246.  He also states that inmates move in and out of their cells at will.  Plaintiffs also present evidence that correctional officers assigned to Annex 246's housing units do not properly follow posting instructions, failing to supervise inmates properly.

Defendants argue that Mr. Rivera-Percy had no knowledge regarding any specific risk faced by the decedent Mr. Rodriguez.  Furthermore, defendants submit evidence that Mr. Rodriguez never complained to AOC officials regarding his personal safety.  Finally, defendants point out that Mr. Rivera-Percy recalls making attempts to purchase and install cell locks for Annex 246.  In sum, defendants argue that nothing in the record shows that Mr. Rivera-Percy knew that Mr. Rodriguez was in danger and that Mr. Rivera-Percy took steps to correct one of the security problems in Annex 246.

As previously explained, liability is not predicated on knowledge of a risk specific to the injured prisoner. Awareness and disregard of risk can be grounded in the obvious. Even despite Mr. Rivera-Percy's attempt to purchase and install cell locks, a reasonable juror could still conclude that his failure to remedy the supervision problems in housing units where he knew inmates were able to and did move freely in and out of their cells amounts to deliberate indifference.

### e.   Defendant Jose Rodriguez-Cruz

Sergeant Jose Rodriguez-Cruz was the supervisor during the shift which began at 10:00 p.m. on July 31, 2005 and ended at 10:00 a.m. on August 1, 2005.  Plaintiffs argue that Mr. Rodriguez-Cruz failed to supervise properly correctional officer Abraham Antonetty, whose assignment requires him to patrol inmate housing where Mr. Rodriguez was held.  Plaintiffs substantiate their allegation of Sgt. Rodriguez-Cruz's failure to supervise by providing evidence that correctional officer Antonetty knew that inmates were moving out of their cells during the night of July 31, 2005, and that, even knowing of that movement, positioned himself in an area with a limited and obstructed view of the area he was supposed to be patrolling.  Finally, plaintiffs submit a report issued by AOC investigating agent Melissa Rodriguez-Roth which reports that, in his sworn testimony, Sgt. Rodriguez-Cruz was present for both the night and morning inmate counts along with officer Antonetty on the July 31 to August 1 shift.  The Court notes that Sgt. Rodriguez-Cruz failed to ascertain that Mr. Rodriguez was dead during the morning count despite AOC requirements that all counts ensure each counted inmate is a live human being.

Again, defendants argue that Sgt. Rodriguez-Cruz cannot be liable because he knew of no risk specific to the decedent, Mr. Rodriguez.  The Court has already determined that

notice of specific threat is not required for liability.  Further, a supervisor may be deemed liable for what he does or does not do "if his behavior demonstrates deliberate indifference to conduct that is in itself violative of a plaintiff's constitutional rights."  Maldonado-Denis, 23 F.3d at 582.

        Based on the foregoing, the Court finds that there is sufficient evidence for a trier of fact to conclude that Sgt. Rodriguez-Cruz's knowledge of risks posed by broken cell locks and Mr. Antonetty's poor staff supervision of inmates in that context amounts to deliberate indifference or negligence.

### f.   Defendant Jose Feliciano-Suarez

        Sergeant Jose Feliciano-Suarez was the supervisor during the shift starting at 6:00 a.m. and ending at 2:00 p.m. on August 1, 2005.  A report issued by AOC investigating agent Melissa Rodriguez-Roth following Mr. Rodriguez's death provides Sgt. Feliciano-Suarez's sworn testimony that the Annex 246 institution has a problem with the cell gates because they do not work properly and inmates can open the gates to change cells freely.  Nothing in the record indicates that Sgt. Feliciano-Suarez took any action to correct the security problems about which he was aware.

        Defendants again argue that Sgt. Feliciano-Suarez had no reason to believe there was any risk specific to Mr. Rodriguez.

For the same reasons given above, the Court finds that a reasonable juror could find that Sgt. Feliciano-Suarez's knowledge and disregard of the damaged cell gates and problem of inmate supervision could constitute deliberate indifference or negligence.

### g.   Defendant Abraham Antonetty

Abraham Antonetty was the correctional officer assigned to patrol the housing area in Annex 246 where Mr. Rodriguez was held during the July 31, 2005 10:00 p.m. to August 1, 2005 6:00 a.m. shift.  Mr. Antonetty testified that he knew that cell locks in Annex 246 were broken.  He admitted seeing inmates moving out of their cells during his shift.  Mr. Antonetty also testified that he abandoned his post during his shift and only returned to the inmate hallways to conduct hourly patrols.  During most of his shift, Mr. Antonetty stayed inside a control pod, where his view of inmates was obstructed.

Defendants argue that Mr. Antonetty told inmates to return to their cells and that he had no notice that Mr. Rodriguez, specifically, was in any danger.

A trier of fact could conclude from the record that Mr. Antonetty's failure to patrol the living area of Annex 246 while he knew inmates were able to freely move around amounts to deliberate indifference or negligence.

### h.    Agustin Pagan

Agustin Pagan was the correctional officer assigned to patrol the housing area of Annex 246 where Mr. Rodriguez was held during the August 1, 2005 6:00 a.m. to 2:00 p.m. shift.   Plaintiffs have alleged no wrongdoing by Mr. Pagan under section 1983.   There is no dispute among the parties that Mr. Pagan discovered Mr. Rodriguez's body during the August 1, 2005 morning count, and then misidentified his body.   The facts presented by plaintiffs regarding Mr. Pagan's negligence in determining the decedent's identity may be relevant for claims brought under Puerto Rico local law, but they are not relevant to any allegations made by plaintiffs under section 1983.   The federal claims against Mr. Pagan are hereby **DISMISSED**.

### B.    Qualified Immunity Standard

The qualified immunity doctrine protects government officers and employees from suit on federal claims for damages where, in the circumstances, a reasonable official could have believed his conduct was lawful.   Olmeda v. Ortiz-Quiñones, 434 F.3d 62 (1st Cir. 2006); Rodriguez-Rodriguez v. Ortiz-Velez, 391 F.3d 36, 41 (1st Cir. 2004).

The Court follows the well-settled three-step process for evaluating qualified immunity claims:   1) whether the plaintiffs have alleged the deprivation of an actual constitutional right; 2) whether the right was clearly established at the time of the

alleged action or inaction; and, 3) if both these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right. See, Vazquez-Valentin v. Santiago-Diaz, 459 F.3d 144, 154, n.6 (1st Cir. 2006) (citing Wilson v. City of Boston, 421 F.3d 45, 52-53 (1st Cir. 2005)).

The Court has already answered the first prong - whether the plaintiffs have alleged the deprivation of an actual constitutional right - in the affirmative.  Plaintiffs' theory of the case depicts a violation of a known constitutional right:  the right to be safe from inmate attack while incarcerated.  Plaintiffs have alleged facts which, together, amount to a violation of Mr. Rodriguez's constitutional right to physical safety.  As a matter of law, the alleged deprivation of protection from other inmates would, if true, constitute a violation of Mr. Rodriguez's Fourteenth Amendment rights as explored in the analysis of the Eighth Amendment above.

The second prong, whether the right was clearly established at the time of the alleged action or inaction, has also been met.  The rights afforded both convicted inmates and pretrial detainees by the Eighth and Fourteenth Amendments are well established, and defendants can be fairly charged with knowing the standard of care both rights imply.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("If the law was clearly established, the

immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct"). Well before Mr. Rodriguez arrived in Annex 246, the law clearly established that certain conditions of confinement violate the rights of prisoners and pretrial detainees and that deliberate indifference to a prisoner's health and safety violates the Eighth Amendment. See Bell, 441 U.S. at 545. Furthermore, because the Morales-Feliciano federal orders were issued well before the events at issue occurred, the parameters of what constitutes constitutionally safe conditions of confinement were also well-settled at the times relevant to Mr. Rodriguez's death.

For supervisors seeking qualified immunity, the clearly established prong is satisfied when "(1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetuated by his subordinates in that context. Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998) (internal citations and quotations omitted). Both elements of the "clearly established" prong of the qualified immunity test for supervisors are met here. The Court has already indicated that the plaintiffs have presented sufficient evidence that could convince a reasonable jury that decedent's right to safety from other inmates was violated, and it is well-settled that a deliberately

indifferent supervisor may be held liable for his or her subordinates' constitutional violations.

The third prong is what is at issue here:  whether an objectively reasonable official would have believed that the action taken violated Mr. Rodriguez's clearly established constitutional right to safety from other inmates.  The qualified immunity doctrine here turns on whether "in the particular circumstances confronted by each [defendant], that [defendant] should reasonably have understood that his conduct jeopardized these rights." Camino-Robles, 151 F. at 7.

Generally, this third prong is weighed objectively and does not hinge on the merits of the underlying constitutional claim.  See Collins v. Marina-Martinez, 894 F.2d 474, 478 (1st Cir. 1990).  Because qualified immunity requires a determination that a defendant's actions were objectively reasonable, a Court typically need not delve into the substantive viability of the suit.  Id. The result is that a plaintiff who might prevail on the merits might nonetheless fail on the issue of qualified immunity.  Id.

In some cases, however, the merits may be "inexorably intertwined with the issue of qualified immunity."  Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990).  The First Circuit Court of Appeals has spoken at length about the "crossroads at which the qualified immunity doctrine and principles of supervisory liability under section 1983 intersect."  Camilo-Robles, 151 F.3d

at 5.    In its discussion, the First Circuit Court of Appeals stated:

> The inquiry into qualified immunity is separate and distinct from the inquiry into merits.   Consequently, courts are well-advised to separate "qualified immunity" analysis from "merits" analysis whenever possible.   In some circumstances, however, these inquiries overlap.  So it is here: the appellants stand accused of culpable conduct in a setting that requires an inquiry into deliberate indifference (which is customarily a merits-related topic.)   Given this setting, discerning whether a particular appellant's behavior passes the context-specific test of objective legal reasonableness to some extent collapses the separate "qualified immunity" and "merits" inquiries into a single analytic unit.

Id. at 7.

This case presents just the sort of crossroads described by the First Circuit Court of Appeals where the merits inquiry satisfies the qualified immunity inquiry.   Here, the analysis already conducted by the Court to determine whether a reasonable juror could find deliberate indifference on the part of each defendant inherently acts as an inquiry into objectively reasonable conduct.

The pleadings submitted in support of and opposition to the summary judgment motion bear out this point.   In their argument over the application of qualified immunity, both parties merely repeat their arguments related to deliberate indifference. Defendants repeat their assertion that plaintiffs failed to prove sufficiently direct causation and restate facts given to substantiate their claim that defendants had no notice of any

threat to Mr. Rodriguez and that defendants therefore did not act

with sufficient culpability (deliberate indifference) to be deemed

unreasonable.  (Docket No. 109)  Plaintiffs, likewise, regurgitate

in their qualified immunity section the arguments they earlier make

regarding deliberate indifference regarding defendants' knowledge

of inmates' constitutional rights.[23]

In its analysis of qualified immunity, the Court will *not*

repeat its reasoning regarding deliberate indifference.  What the

Court believes stands clear is that a reasonable prison official

working in the Puerto Rico prison system would have known that a

lack of supervision inside housing units impacts safety.  Coupled

with the knowledge that cell locks do not function, inadequate

supervision would create an obvious and undeniable security risk.

The fact that the defendants held various degrees of responsibility

and possessed varying abilities to correct these obvious security

problems does not obliterate their individual obligations to report

on and correct problems they know threaten inmate safety.

Defendants' simply do not provide any facts, other than one letter

documenting the attempt made by Victor Rivera-Percy to purchase and

---

[23] The Court notes, with disapproval, the inadequate discussion provided by plaintiffs on the issue of qualified immunity.  In its opposition to the summary judgment motion, plaintiffs only address the first two prongs of qualified immunity and utterly ignore the last prong. (Docket No. 128)  Defendants fare only slightly better.  In defendants' summary judgment motion, defendants merely offer a list of reasons why the link between defendants' action and the death of Mr. Rodriguez is a weak one.   They do not address whether defendants' behavior is objectively reasonable, or use the terminology of the qualified immunity standard in their discussion.  (Docket No. 109)

install cell locks, that shows any efforts to improve inmate supervision, replace locks, change light bulbs, discipline staff, implement policies, approve funding for repairs, or correct other deficiencies about which, plaintiffs adequately demonstrate, defendants clearly *knew*.

The Puerto Rico prison system, in which defendants worked, suffers from the unfortunate history of being a distinctively and seriously deficient one, and this work context shapes the determination of what can be considered reasonable. See Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 562 (1st Cir. 1988). Here, the conditions of Mr. Rodriguez's confinement were no secret. The risks associated with those confinement conditions were also no secret; indeed, they were the very risks addressed and outlawed by federal orders meant to address and eliminate precisely the sorts of security risks plaintiffs claim resulted in Karl Michael Rodriguez's death.

The Morales-Feliciano court orders, prior Eighth Amendment law, various court decrees, and the obviousness of the security problems presented in this record, that permit a finding of deliberate indifference, also serve to preclude the use of qualified immunity. Accordingly, the defendants' request for qualified immunity is **DENIED.**

## V.    Supplemental Claims

Because a federal cause of action remains outstanding, the petition to dismiss the supplemental claims under Puerto Rico law is **DENIED**, except that the claims under Puerto Rico law against defendants Collette Santa-Rodriguez and Melvin Burgos-Brandi, are **DISMISSED**.

### CONCLUSION

Based on the foregoing, defendants motion for summary judgment is disposed of as follows:  the claims under the Fifth Amendment are **DISMISSED**.  All claims against defendants Collette Santa-Rodriguez and Melvin Burgos-Brandi are **DISMISSED**.  The federal claims against defendant Agustin Pagan are **DISMISSED**.  The section 1983 claims for deliberate indifference to the safety of inmates housed at Annex 246 which culminated in the death of Karl Michael Rodriguez remain against codefendants:  (1) Miguel Pereira-Castillo, (2) Abraham Antonetty-Santiago, (3) Victor Rivera-Percy, (4) Jose Feliciano-Suarez, and (5) Jose Rodriguez-Cruz.  The supplemental claims based on Puerto Rico law remain against: (1) Miguel Pereira-Castillo, (2) Abraham Antonetty-Santiago, (3) Victor Rivera-Percy, (4) Jose Feliciano-Suarez, (5) Jose Rodriguez-Cruz, and (6) Agustin Pagan.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, January 16, 2009.

                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              UNITED STATES DISTRICT JUDGE